2015-1911
(Reexamination Control Nos. 90/010,381; 90/011,454; and 90/011,713)

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
_____

**In re NATURAL ALTERNATIVES, LLC,**

**Appellant.**

_____
Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board.
_____

**CORRECTED BRIEF FOR APPELLEE – DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE**

THOMAS W. KRAUSE
Acting Solicitor

SCOTT C. WEIDENFELLER
Acting Deputy Solicitor

MARY L. KELLY
AMY J. NELSON
Associate Solicitors

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

*Attorneys for the Director of the*

January 28, 2016          *United States Patent and Trademark Office*

## **Illustrative claims 1 and 6**

     1.    A composition for deicing and inhibiting the formation of ice and snow on surfaces comprising

        from 25-99% by volume of desugared sugar beet molasses having 60-75% suspended solids and

        1-75% by volume of a component selected from the group consisting of

            sodium formate, calcium magnesium acetate, potassium acetate, ethylene glycol, di- ethylene glycol, magnesium chloride, calcium chloride, sodium chloride, potassium chloride and mixtures thereof.


     6.    A composition for deicing or inhibiting the formation of ice and snow on surfaces comprising

        a mixture of

            desugared sugar beet molasses and

            rock salt

        including from 8-10 gallons of desugared beet molasses per ton of rock salt.

# TABLE OF CONTENTS

I.  STATEMENT OF THE ISSUE ....................................................................1

II.  STATEMENT OF THE CASE AND RELEVANT FACTS .........................2

    A.  The claimed deicing compositions .....................................................2

    B.  The prior art .......................................................................................5

        1.  Zdzislaw .................................................................................5

        2.  Daly .......................................................................................6

        3.  Public Works .........................................................................8

    C.  The Board's decisions .......................................................................11

        1.  The Board's Final Decision .................................................11

        2.  The Board's decision on request for rehearing.......................15

III.  SUMMARY OF THE ARGUMENT .............................................................18

IV.  ARGUMENT.................................................................................................22

    A.  Standard of review.............................................................................22

    B.  Substantial evidence supports the Board's determination that the claimed antifreezing and deicing compositions would have been obvious in view of Zdzislaw and Daly and/or Zdzislaw, Daly, and Public Works .....................................................................................24

        1.  The ordinary artisan would have taken into account any differences between Zdzislaw's DSBM and other DSBMs, and optimized the relative amounts of DSBM and other components to achieve those recited in representative claims 1 and 6 .......................................................................26

        2.  Daly is analogous prior art because it is "reasonably pertinent" to the problem facing the inventor of the '330 patent .....................................................................................28

3.      Daly does not teach away from claimed composition simply by stating that inorganic salts are "not necessary" to achieve the antifreezing benefits of DSBM and, therefore, "not preferred" ..................................................................................32

4.      A person of ordinary in the art would have optimized the ratios of DSBM and salt disclosed in Public Works to achieve the claimed proportions ...............................................34

C.    Natural's evidence of commercial success and industry praise relates entirely to the well-established properties of prior art DSBM compounds, and not to any unique properties of the claimed composition ........................................................................................36

V.    CONCLUSION..............................................................................................40

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                                 **<u>Page(s)</u>**

*Berg, In re*, 320 F.3d 1310 (Fed. Cir. 2003) ...........................................................23

*Clay, In re*, 966 F.2d 656 (Fed. Cir. 1992) ..............................................................31

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)................................................23

*Dance, In re*, 160 F.3d 1339 (Fed. Cir. 1998) ........................................................40

*DBC, In re*, 545 F.3d 1373 (Fed. Cir. 2008) ...........................................................28

*Dembiczak, In re*, 175 F.3d 994 (Fed. Cir. 1999) ...................................................26

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc*.,
    567 F.3d 1314 (Fed. Cir. 2009)......................................................................33

*Fulton, In re*, 391 F.3d 1195 (Fed. Cir. 2004) ........................................................33

*Gartside, In re*, 203 F.3d 1305 (Fed. Cir. 2000)............................................. 23, 24

*GPAC Inc., In re*, 57 F.3d 1573 (Fed. Cir. 1995) ........................................... 36, 39

*Gurley, In re*, 27 F.3d 551 (Fed. Cir. 1994)............................................................32

*Huang, In re*, 100 F.3d 135 (Fed. Cir. 1996)................................................ 23, 36, 39

*ICON Health & Fitness, Inc, In re*, 496 F.3d 1374 (Fed. Cir. 2007) ......................32

*Jolley, In re*, 308 F.3d 1317 (Fed. Cir. 2002) .................................................. 23, 34

*Kotzab, In re*, 217 F.3d 1365 (Fed. Cir. 2000) .......................................................23

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) ...............................................24

*Kubin, In re*, 561 F.3d 1351 (Fed. Cir. 2009) .........................................................24

*Mayne, In re*, 104 F.3d 1339 (Fed. Cir. 1997) .......................................................23

*Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299 (Fed. Cir. 2006).........................36

*Para-Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc*.,
    73 F.3d 1085 (Fed. Cir. 1995)........................................................................23

*Paulsen, In re*, 30 F.3d 1475 (Fed. Cir. 1994) ........................................................39

*Rijckaert, In re*, 9 F.3d 1531 (Fed. Cir. 1993) ........................................................26

*Thrift, In re*, 298 F.3d 1357 (Fed. Cir. 2002) ..................................................... 22-23

*Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358 (Fed. Cir. 2011) ..............36

*Watts, In re*, 354 F.3d 1362 (Fed. Cir. 2004) ..................................................... 22, 34

*Wyers v. Master Lock Co.*, 616 F.3d 1231 (Fed. Cir. 2010) ....................... 23, 28, 30

## **Statutes**

35 U.S.C. § 102(b) ........................................................................................11

35 U.S.C. § 103 ..................................................................... 11, 15, 26, 40

35 U.S.C. § 103(a) .........................................................................................24

35 U.S.C. § 112(b) ........................................................................................11

35 U.S.C. § 112, second paragraph .........................................................11

35 U.S.C. § 305 ..............................................................................................11

## **Regulations**

37 C.F.R. § 41.52(a)(1) ..............................................................................16

## STATEMENT OF RELATED CASES

Natural Alternatives, LLC ("Natural") seeks relief from the final written decision of the Patent Trial and Appeal Board ("Board") of the U. S. Patent and Trademark Office ("USPTO") in three consolidated reexaminations, Reexamination Control Nos. 90/010,381; 90/011,454; and 90/011,713, of its patent, U.S. Patent No. 6,080,330 ("the '330 patent").  The Director is unaware of any other appeal from the Board that has previously been or is currently pending before this Court related to this patent.

It is the Director's understanding that the '330 patent was the subject of litigation styled *Natural Alternatives, LLC and Todd Bloomer v. Univar USA Inc.*, Case No. 5:08-c-473 (E.D. Ky.), and that this litigation was dismissed without prejudice at Natural's request in 2009.  The defendant in that suit is the third-party requester in the reexamination proceedings below.  The Director is unaware of any other court case that will affect or be directly affected by a decision in this appeal.

# I.     STATEMENT OF THE ISSUE

The '330 patent claims a composition for deicing and inhibiting ice and snow formation containing desugared beet molasses ("DSBM").  Representative claim 1 recites an antifreezing and deicing composition comprising:  (1) 25-99% by volume DSBM having 60-75% by volume suspended solids, and (2) 1-75% by volume of a component selected from a group including ethylene glycol and sodium chloride.  Representative claim 6 recites a deicing mixture comprising DSBM and rock salt at a ratio of 8-10 gallons of DSBM per ton of rock salt.

Antifreezing and deicing compositions containing DSBM were known in the prior art.  Zdzislaw discloses an antifreezing composition comprising DSBM and ethylene glycol(s) in amounts that overlap the ranges recited in claim 1.  Daly discloses DSBM that includes suspended solids in the claimed range.  And, Public Works discloses compositions comprising 8 gallons of DSBM per one ton of a road salt-cinder mix that have superior antifreezing and deicing properties.

The Board found a person of ordinary skill in the art would have adjusted the relative proportions of DSBM and ethylene glycol in Zdzislaw's composition to arrive at the ranges recited in claim 1 based on Zdzislaw's teaching that freezing temperature, viscosity and appearance may be manipulated according to weather conditions by adjusting the ratio of DSBM to ethylene glycol(s).

The Board similarly determined that representative claim 6 would have been obvious over Zdzislaw, Daly, and Public Works because it would have been obvious to replace the polyhydroxide alcohol in Zdzislaw's composition with the salt disclosed in Public Works and then to adjust their ratios to achieve the claimed ranges based on Zdzislaw's teachings about optimization.

The sole issue on appeal is whether substantial evidence supports the Board's obviousness determinations.

## II.   STATEMENT OF THE CASE AND RELEVANT FACTS

### A.   The claimed deicing compositions

The '330 patent concerns antifreezing and deicing compositions made from desugared beet molasses (DSBM), a byproduct of the "process[] for removing sugar from sugar beet molasses."  (A4 at col.5, ll.4-6.)  The '330 patent acknowledges that molasses byproducts have been used in antifreezing and deicing compositions for at least two decades.  For example, the '330 patent discloses that, in the late 1980s, Jeno Toth of Hungary proposed using compositions containing mixtures of inorganic salts and molasses byproducts of alcohol distillation as antifreezing and deicing agents.  (A2 at col.1, ll.44-55 (citing U.S. Patent 4,676,918 (issued Jun. 30, 1987).)  The '330 patent also acknowledges that, as early as 1997, others had shown that mixtures comprising inorganic salts and the byproducts from other distillation processes – e.g., waste products from corn-milling, wine production, and cheese-

2

making – could also be used as antifreezing and deicing compositions. (A2 at col.1, ll.56-62 (citing U.S. Patent Nos. 5,653,101; 5,709,812; and 5,709,813).) The '330 patent cites Daly for disclosing the use of DSBM as ballast in pneumatic tires for farming and other outdoor equipment based on its low freezing point, viscosity, flow rate, environmental friendliness and non-corrosive properties. (A4 at col.5, ll.29-61.) The '330 patent asserts that the claimed composition differs from these prior art compositions because it is environmentally friendly, inexpensive, and can be added to inorganic salts to reduce corrosiveness and further lower freezing temperature. (*See*, *e.g.*, A2 at col.2, ll.59-65.)

The '330 patent describes the "two most widely used processes" for making DSBM as an "older" centrifugation process, and the "more modern" Steffen process used by Daly. (A4 at col.5, ll.9-44) Although the '330 patent discloses that DSBM made using the Steffen process "exhibits slightly better anti-freezing and deicing properties" than DSBM made by the centrifugation process, the '330 patent discloses that DSBMs made from both processes "will generally serve equally well" in the claimed composition and "the manner of producing the [DSBM] is not critical to the present invention[.]" (A4 at col.5, ll.37-44.)

The '330 patent discloses that, in addition to DSBM, the claimed composition may include "other types of known chemical anti-freezing or deicing agents," such as "sodium formate, calcium magnesium acetate, potassium acetate, ethylene glycol,

3

di-ethylene glycol, or chloride salts, such as calcium chloride, magnesium chloride, or sodium chloride (preferably in the form of rock salt)." (A3 at col.4, ll.7-14.)

As shown below, the deicing composition of representative claim 1 comprises: (1) 25-99% by volume DSBM, and (2) 1-75% by volume salt selected from a group of components including ethylene glycol and sodium chloride:

> 1.    **A composition** for deicing and inhibiting the formation of ice and snow on surfaces **comprising**
> from **25-99% by volume** of **desugared sugar beet molasses** having 60-75% suspended solids and
> **1-75% by volume** of a component selected from the group consisting of
> sodium formate, calcium magnesium acetate, potassium acetate, **ethylene glycol**, di-ethylene glycol, magnesium chloride, calcium chloride, **sodium chloride**, potassium chloride and mixtures thereof.

(A10 (emphasis added); *see also* A322-A355.) Representative claim 6 recites a deicing mixture comprising 8-10 gallons of DSBM per ton of rock salt:

> 6.    A **composition** for deicing or inhibiting the formation of ice and snow on surfaces **comprising**
> a mixture of
> desugared sugar beet molasses and rock salt
> including from **8-10 gallons of desugared beet molasses per ton of rock salt**.

(A10 (emphasis added); *see also* A322-A335.)

4

**B.    The prior art**

**1.    Zdzislaw**

Zdzislaw[1] (A50-54) discloses a composition comprising DSBM and ethylene glycol(s) that is sprayed onto bulk materials, such as coal, metal ores, and stone minerals, in order to prevent freezing during storage and transportation.  (A51.) Zdzislaw discloses that his composition has a "low freezing temperature, good wettability and bulk material penetration," and "high efficiency in terms of preventing freezing and adhesion of bulk materials even with [a] high percentage of water and in low temperatures up to minus 35° C [-31° F]."  (A53.)

Zdzislaw's antifreezing composition comprises 10-85 parts by mass polyhydroxide alcohols, 5-55 parts by mass DSBM, 10-60 parts by mass water, and 0-10 parts by mass additives.  (A50, A51.)  Zdzislaw discloses that suitable polyhydroxide alcohols for use in his antifreezing composition include ethylene glycols and propylene glycols.  (A52.)  Zdzislaw discloses that the DSBM component of his antifreezing composition, is "obtained as drained mass after centrifuging sugar from concentrated beet juice."  (A51; *see also* A52.)  Zdzislaw

---

[1]  Zdzislaw *et al*. (PL 164018 B1, published Nov. 7, 1990) ("Zdzislaw").  The Director notes that the full name of the first-named inventor is Zdzislaw Jagodzinski.  (*See* A50.)  Because this publication was consistently (although erroneously) referred to using the first-named inventor's given name rather than his family name in the proceedings below, the Director will continue this (erroneous) designation here.

discloses that molasses produced by this centrifugation process contains "approximately 50% of sugar, 20% of salts of organic acids, organic alkali and nitrogen compounds, 10% of inorganic compounds and 20% of water." (A52.)

In Examples I-III, Zdzislaw demonstrates that the viscosity, freezing temperature, and appearance of his composition can be varied by adjusting the ratio of DSBM to polyhydroxide alcohol. (A53.) According to Zdzislaw, these data demonstrate that, as an "additional benefit," his composition allows users to adjust the "characteristics [of his composition] according to the properties of transported material and weather conditions." (A53.)

### 2.    Daly

Daly[2] (A41-A49) teaches the use of desugared molasses, particularly DSBM, as ballast in pneumatic tires for farm and other outdoor equipment. (A48 at col.4, ll.36-40.) According to Daly, desugared molasses is an ideal tire ballast for these types of equipment because it "flow[s] in very low temperatures (-30º F. and below)." (A47 at col.1, ll.44-50; *see also* A47 at col.1, ll.53-55; A48, col.3, ll.10-14.) Daly discloses as added advantages that desugared molasses is "less than half" the price of regular molasses, and is "non-toxic, non-abrasive, non-corrosive, biodegradable and environmentally friendly." (A47 at col.2, ll.62-67.)

---

[2] Glendon Daly *et al.*, U.S. Patent No. 5,639,319 (issued June 17, 1997)

According to Daly, preferable desugared molasses has "less than 30% by weight sucrose." (A41 at Abstract.) Although Daly observes that desugared molasses may be produced as a byproduct of corn, sorghum, soybean, or cane sugar processing, Daly focuses on DSBM. For example, Daly discloses that DSBM has a lower sugar and higher fiber content than desugared cane molasses. (A47 at col.2, ll.31-38.) Daly identifies the names of several (then-current) U.S. producers of DSBM, and discloses that each uses the Steffen process to produce DSBM. (A47 at col.2, ll.44-51; A48 at col.3, ll.19-23.) Daly does not provide the names of the producers of other types of (non-beet) desugared molasses, and DSBM is the only type of desugared molasses specifically recited in Daly's claims. (A49 at col.5, ll.34-35; col.6, ll.21-22.)

Daly further discloses that desugared molasses can be combined with inorganic salts such as "calcium chloride or magnesium chloride, if the amount is less than about fifty percent (50%) by weight." (A48 at col.3, ll.4-7.) Daly discloses however that, due to DSBM's excellent anti-freezing and anti-corrosive properties, the addition of inorganic salts to desugared molasses is "unnecessary" and "not preferred." (A48 at col.3, ll.4-7, 10-11.)

Notably, the '330 patent – i.e., the patent on appeal – cites Daly for disclosing the Steffen process for making DSBM. (A37 at col. 5, ll. 29-33.) The '330 patent also expressly incorporates by reference Daly's teachings as they "relate[] to the

production of [DSBM] and the *properties* and various suppliers thereof." (A37 at col.5, ll.33-36 (emphasis added).)

### 3.    Public Works

Public Works[3] (A56-A57) discloses the experiences of the Washington State Department of Transportation ("WDOT") and several New York State municipalities using ICE BAN® as an antifreezing and deicing product on their roadways. (A56.) Public Works describes ICE BAN® as being made from "the concentrated liquid residue of the fermentation and distillation of alcohol (ethanol) and the processing of other agricultural products . . . such as cane or beet sugar syrup (molasses), corn, barley, [or] other carbohydrates." *Id.* Public Works states that desugared molasses has deicing properties not found in raw molasses, as well as a "much lower viscosity." *Id.*

According to Public Works, ICE BAN® is "biologically and environmentally inert, non-corrosive, and has no adverse effects on the roads, infrastructure, and vehicles." *Id.* Public Works additionally reports that, although ICE BAN® costs more than chloride salts, ICE BAN® "reduce[s] the direct total cost of de-icing, so there is no resistance to the [then-]current price of $200 per ton." (A56-A57.) According to Public Works, this reduction in de-icing costs does "not take into

---

[3]  *Winter is Hell*, Public Works, July 1997, pp. 56-57 ("Public Works").

consideration the long term residual cost of chloride salt damage, which [had] been estimated to be over $15 billion annually." (A57.)

Public Works also includes a field report ("Field Report 1"), describing the WDOT's experiences using ICE BAN® on roadways at temperatures below -25º F. (A56.) Field Report 1 states that ICE BAN® "display[ed] residual effectiveness greater than straight magnesium chloride under similar frost conditions," and was able to maintain "a bare and wet road for the first inch of [a snow] storm," and prevented snow pack up to 4 inches of snow. *Id.* Field Report 1 also states that ICE BAN®'s thick viscosity provides it with excellent deicing properties, and quotes a former WDOT employee stating that he "[had] never seen anything that works so fast and so well in all [his] years up here." *Id.*

Public Works includes a second field report by the Webster, New York Highway Department Superintendent of Highways ("Field Report 2"), describing the use of ICE BAN® during the winters of 1994-1995 and 1995-1996. (A57.) Field Report 2 details the results of treating roads with a mixture of 8 gallons of ICE BAN® per ton of a mix consisting of 25% road salt and 75% crushed cinders. *Id.* Field Report 2 states that "[t]he snow pack that normally develops during [a] storm broke up by itself and did not need to be treated with [a] straight salt and scraped off" on roads treated with the ICE BAN® mixture, and that ICE BAN® "seemed to provide better traction than the [road salt-cinder] mix . . . or even straight salt." *Id.*

9

Field Report 2 also states that ICE BAN® allowed the Webster Highway Department to "provide a level of service at a much lower cost by using a product that is less corrosive and biodegradable." *Id.*

Public Works additionally relays the experiences of five other New York State municipalities that used ICE BAN® during the 1996-1997 winter, illustrated by the following statements:

- "8 gal/ton were used, reducing lane mile applications by 50[%] as well as eliminating rust on the spreader pans."

- "Cut[s] lane mile applications by 40 percent, achieved better deicing, and also experienced residue effect."

- "[N]o hard packed snow" with an 8 gallon per ton mix compared to neighboring town with "hard pack snow using a 30 percent salt/sand mix."

- "[S]ticks to the ground like glue and the residual effect is excellent."

- "[U]se[d] the product both onboard his trucks and to melt and break up salt stock piles."

(A57.)

**C.    The Board's decisions**

**1.    The Board's Final Decision**

The Board affirmed the Examiner's obviousness rejections based on Zdzislaw.[4]  More specifically, the Board affirmed the rejection of claims 1-23 and 25-55 under 35 U.S.C. § 103 as obvious in view of Zdzislaw and Daly, or Zdzislaw, Daly and Public Works.  (A24.)  The Board found claims 1 and 6 representative of the claimed composition for purposes of these rejections.  (A10, 17, 23.)  For economy's sake, discussion is limited to only those portions of the Board's decisions that are relevant to the issues raised in Natural's opening brief to this Court.

The Board found that Zdzislaw discloses an antifreezing composition having amounts of DSBM and ethylene glycol that overlap the ranges recited in representative claim 1.  (A17.)  Because Zdzislaw expresses the amounts of DSBM and ethylene glycol in his antifreezing composition using % *by weight* and representative claim 1 recites these amounts using % *by volume*, the Board began its analysis by adopting the Examiner's calculations to convert the amounts of DSBM and ethylene glycol in Zdzislaw's composition from % by weight to % by

---

[4]  More specifically, the Board reversed Rejections 1-4, i.e., the rejection of claim 54 under 35 U.S.C. §§ 112(b) (formerly § 112, second paragraph) and 305; as well as the rejection of claims 6 and 7 under 35 U.S.C. § 102(b).  (A24-A25.) Having affirmed Rejections 15 and 17, the Board also found it unnecessary to reach Rejections 5-14, 16, and 18.  *Id.*

11

volume. (A17-A18.) These calculations employed the densities for DSBM and

ethylene glycol provided in Daly and Bulk Density Chart[5], respectively:

> Zdzislaw also discloses that the composition comprises 10 to 85 parts by mass (weight) of polyhydroxide alcohols, 5 to 55 parts by mass of desugared sugar beet molasses (DSBM), and 10 to 60 parts by mass of water (claim 1 of Zdzislaw [A53]). The DSBM is obtained as drained mass after centrifuging sugar from condensed beetroot juice (claim 1). The polyhydroxide alcohols include ethylene glycols ([A53], first paragraph).

> The density of ethylene glycol is 68 lbs/ft$^3$ (Bulk Density Chart [A98]) or 9.25 lbs/gal. The density of DSBM is 8-11.6 lbs/gal ([A47], col. 2, line 42). It is well-known that the density of water is 8.34 lbs/gal. Using these density values, the following table [located at A205] shows the conversion of "percent by weight" to "percent by volume" of the composition comprising 5-55% by weigh[t] of the DSBM, 10 to 85% by weight of ethylene glycol, and the balance being water.

(A205-A206 (cited by Board at A17).) Relying on these calculations, the Board

found that the ranges of component materials in Zdzislaw's composition – i.e., 4-

47% by volume DSBM and 11-85% by volume alcohol – overlap with the ranges

recited in representative claim 1 – i.e., 25-55% by volume DSBM and 1-75% by

volume ethylene glycol. (A17-A18.)

---

[5] Material Bulk Density Reference Chart,
http://replay.web.archives.org/2002101111347/http://www.ppd-inc.com/material.htm (May 12, 2011) ("Bulk Density"). (A83-A101.)

Notably, the Board agreed with the Examiner that a person of ordinary skill in the art would have adjusted the relative proportions of DSBM and ethylene glycol(s) in Zdzislaw's antifreezing composition to achieve the desired properties, particularly given Zdzislaw's examples showing that characteristics "such as viscosity, freezing temperature, and appearance are affected by the ratio of DSBM to alcohol." (A18 (citing A53 at Examples I-III).)

The Board was unpersuaded by Natural's argument that Daly's DSBM could not be used to calculate the density of Zdzislaw's DSBM because Zdzislaw's DSBM is desugared by a centrifugation process, while Daly DSBM is desugared by the Steffen process. (A18.) The Board found this argument contradicted by the '330 patent's disclosure that DSBMs made by both processes will "serve equally well" in the claimed composition. (A19 (quoting A4 at col.5, ll.42-44 ("[I]t should be realized that [DSBM made by] both [processes] will generally serve equally well for purposes of the composition of the present invention.")).) The Board also found that, although Daly uses DSBM prepared by the Steffen process and Zdzislaw uses DSBM prepared by centrifugation, it was unlikely "that the densities of the two DSBMs would be so different as to result in values outside the broad range of DSBM recited in claim 1." (A19 at n.3.) The Board further found that, even accepting that Daly's and Zdzislaw's DSBMs have different densities, a person of ordinary skill in the art would have optimized the amount of DSBM and

ethylene glycol(s) in Zdzislaw's composition to achieve the claimed percentages – particularly given Zdzislaw's guidance about adjusting the relative amounts of these components.  (A19.)

Regarding representative claim 6, while the Board acknowledged that Public Works does not disclose mixing 8 gallons of DSBM per ton of rock salt, the Board found it would have been obvious to optimize the ratio of DSBM and rock salt disclosed in Public Works to achieve the claimed deicing compositions of representative 6.  (A23-24 (citing A313).)  The Board found this especially true given Public Works' disclosure of three different examples of deicing compositions containing 8 gallons of DSBM per a ton of salt-containing mix, similar to that recited in representative claim 6.  (A24 (citing A56-A57); *see also* Examiner's findings at A192-A193, A209.)  Accordingly, the Board found that Natural had shown no reversible error in the Examiner's rejection of representative claims 1 and 6.

The Board was similarly unpersuaded by Natural's secondary considerations evidence, finding no nexus between the claimed invention and industry praise for GEOMELT®, a commercial product Natural alleges falls within the scope of its claims.  (A19.)  For example, the Board found that, although the report "Beet Juice Beats Salt" praises GEOMELT® for performing better than salt alone, Public Works had already disclosed that mixtures like Ice Ban® – a different deicing

14

product containing DSBM – performs better than salt alone.  (A20.)  The Board also found that the declarations by Natural's licensees similarly failed to establish that GEOMELT®'s alleged commercial success is attributable to "elements of the claimed mixture extending beyond the well-known de-icing properties of [other, known] DSBM[- salt] mixtures." *Id.*  Accordingly, the Board found that Natural had shown no reversible error in the Examiner's rejection of representative claims 1 and 6.

Because Natural failed to make separate nonobviousness arguments with respect to its remaining rejected claims, the Board found that all of Natural's claims would have been obvious to a person of ordinary skill in the art based on the combined disclosures of Zdzislaw, Daly, and Public Works.  Having affirmed the rejection of all claims on these grounds, the Board found it unnecessary to reach the other remaining rejections under 35 U.S.C. § 103.  (A24.)

## 2.    The Board's decision on request for rehearing

The Board denied Natural's Request for Rehearing.  The Board found that Natural had failed to demonstrate that the Final Decision overlooked alleged differences between Zdzislaw's DSBM and the DSBM used in the claimed composition.  More specifically, Natural had argued that the Final Decision failed to consider that Zdzislaw allegedly does not disclose DSBM and/or that Zdzislaw's DSBM is made by a different process than the Steffen process discussed in

the '330 Patent.  (A32 (citing A310-A313).)  The Board found that Natural had

waived these arguments by not making them earlier.  (A33-A34 (citing 37 C.F.R.

§ 41.52(a)(1)).)  The Board also found the arguments to lack merit to the extent

that they reraise Natural's earlier argument that Daly and Zdzislaw used different

DSBMs.  (A34.)

The Board similarly found rehearing unnecessary to consider Natural's

arguments about Public Works.  Natural had argued that Public Works could not

be used to establish the obviousness of the claimed composition because the ICE

BAN® disclosed in Public Works allegedly does not contain DSBM.  (A36-A37

(citing A129).)  The Board found that Public Works discloses a mixture of rock

salt and "a molasses of beet sugar syrup with much of the sugar removed" in the

same ratios as the claimed composition.  (A37.)  The Board also found that Public

Works discloses that, like the claimed composition, "Ice Ban is biologically and

environmentally inert, non-corrosive, and has no adverse effect on roads."  (A36

(citing A56).)  Given these similarities, the Board concluded that neither it nor the

Examiner erred by relying on Public Works' disclosures about ICE BAN® to find

the claimed composition obvious.  (A37.)  The Board further found that any

oversight that may have occurred because this argument was not expressly

addressed in the Final Decision did not warrant rehearing.  (A37.)

16

The Board additionally found rehearing unnecessary to address Natural's allegation that the Final Decision did not address the Examiner's findings about optimizing the ratios of DSBM and rock salt in ICE BAN® to achieve the claimed composition.  (A37 (citing A129-A130).)  The Board found that the Final Decision adequately discussed Public Work's field tests of the ICE BAN® mixture and pure DSBM, and concluded with a statement that "Public Works provides further supporting evidence for the Examiner's position that it would have been obvious to optimize the ratio for the ideal mixture of DSBM and salt."  (A37-A38 (quoting A22-A23).)  Accordingly, the Board denied Natural's request for rehearing on this ground.

Finally, the Board found rehearing unwarranted to consider Natural's argument that it misapprehended Natural's secondary considerations evidence. The Board reiterated that Natural's evidence about the advantages of GEOMELT® merely restate what was already known in the art:  that "DSBM[-salt] mixture[s] work[] better than salt alone."  (A36.)  The Board found that Natural had not presented any evidence demonstrating that GEOMELT®'s alleged success is due to advantages of the claimed DSBM-salt mixture when compared to other DSBM-salt mixtures like those disclosed in Public Works – i.e., when compared to the closest prior art.  As such, the Board reaffirmed its finding that Natural's secondary considerations evidence lacks a nexus to the claimed subject matter.  (A36 (citing

17

A19-A20, Examiner's Answer at A253-A256).)  The Board also found that the

failure of the Final Decision to individually discuss each of Natural's exhibits did

not warrant rehearing.  (A36.)

This appeal followed the Board's Decision on Request for Rehearing.

### III.    SUMMARY OF THE ARGUMENT

Substantial evidence supports the Board's findings and ultimate

determination that the claims on appeal would have been obvious in view of the

combined teachings of Zdzislaw, Daly, and Public Works.  The claims on appeal

are directed to a composition for deicing and inhibiting ice and snow formation

containing DSBM.  Representative claim 1 recites an antifreezing and deicing

composition comprising:  (1) 25-99% by volume DSBM, and (2) 1-75% by volume

a component selected from a group including ethylene glycol and sodium chloride.

Representative claim 6 recites a deicing mixture comprising DSBM and rock salt

at a ratio of 8-10 gallons of DSBM per ton of rock salt.

The Board found that representative claim 1 would have been obvious in

view of:  (1) Zdzislaw's disclosure of an antifreezing composition comprising

DSBM and ethylene glycol(s) in amounts that overlap the ranges recited in claim

1, in combination with (2) Daly's disclosure of methods of manufacturing DSBM.

The Board similarly found that representative claim 6 would have been obvious in

view of Zdzislaw and Daly, taken in further combination with Public Works'

18

disclosure that DSBM alone and compositions comprising 8 gallons of DSBM per one ton of a road salt-cinder mix exhibit superior antifreezing and deicing properties when compared to either the road salt-cinder mix or road salt alone. More specifically, the Board adopted the Examiner's calculations showing that the ranges of DSBM and ethylene glycol(s) disclosed by Zdzislaw overlap with those recited in representative claim 1, and that a person of ordinary skill in the art would have adjusted the relative proportions of DSBM and these other components to arrive at the ranges recited in claim 1 based on Zdzislaw's teaching that freezing temperature, viscosity and appearance may be manipulated according to weather conditions by adjusting the ratio of DSBM and other components. The Board similarly found that the ranges of DSBM and salt disclosed by Zdzislaw and Public Works overlap those recited in representative claim 1, and that the ordinary artisan would have optimized these prior art ranges to achieve the ranges recited in representative claims 1 and 6. Each of Natural's arguments to rebut this strong *prima facie* case of obviousness is unmerited.

Natural cannot rebut obviousness by arguing that Zdzislaw's DSBM is not comparable to the DSBM disclosed by Daly and/or recited in representative claim 1. The Examiner made several calculations to convert the amounts of DSBM and the ethylene glycol(s) in Zdzislaw's composition from % by weight to % by volume so they could be compared to the amounts of these components recited in

19

representative claim 1.  To do so, the Examiner used the densities for DSBM disclosed in Daly – which the '330 patent incorporates by reference – and the densities of ethylene glycol(s) disclosed in Bulk Density Chart.  Natural argues that these calculations "may be" wrong because Zdzislaw's DSBM is made by the older centrifugation process, while the DSBM disclosed in Daly and recited in claim 1 are made by the more modern Steffen process.  The Board found these assertions to be meritless given the express disclosure in the '330 patent that DSBMs from both processes will "serve equally well" for purposes of the claimed composition.  Accordingly, the Board found that the density of Zdzislaw's DSBM would not be so dissimilar to the DSBM recited in claim 1 as to negate the Examiner's calculations.  The Board also found that ordinary artisans would have taken into account any differences in DSBMs, and optimized the relative amounts of DSBM and the other components to arrive at compositions within the broad ranges recited in claim 1 based on Zdzislaw's teaching that freezing temperature, viscosity, and appearance may be manipulated according to weather conditions by adjusting the relative amount of DSBM and other components.

Natural cannot rebut obviousness by arguing that Daly is nonanalogous prior art.  Daly is reasonably pertinent to the problem facing the inventor of the claimed composition:  finding a low cost, environmentally friendly, non-corrosive distillation byproduct that will flow at temperatures well below freezing, and not

clog spraying and spreading devices.  Daly discloses that DSBM has all of these

properties and more.  For example, Daly discloses the Steffen process for making

DSBM having the claimed range of suspended solids, and includes the names of

several U.S. manufacturers making DSBM by this process.  In fact, Daly is so

pertinent to the problem facing the inventor that the'330 patent expressly

incorporates by reference Daly's teachings about DSBM's properties, production,

and suppliers.  Thus, Daly is analogous prior art under the second prong of the

analogous art inquiry.

Natural cannot rebut obviousness by arguing that Daly teaches away from

combinations of DSBM and inorganic salts.  For a reference to teach away, it must

criticize, discredit, or discourage following a particular path.  For example, a

reference teaches away where combining it with the teachings in another reference

would result in an inoperable invention.  Here, Daly merely reports that inorganic

salts are "unnecessary" to achieve a fluid state at temperatures as low as -30º F

(and below), and "not preferred" due to their corrosive properties.  Accordingly,

Daly's disclosure does not meet the legal standard for teaching away.

Natural also cannot rebut obviousness by merely arguing that the amounts of

DSBM and inorganic salts disclosed in Public Works "may be" incorrect.  The

Examiner presented several calculations to convert the % by weight amounts

disclosed in Public Works to % by volume amounts so they could be compared to

21

the ranges recited in representative claim 1.  As with Zdzislaw, the Examiner used

the densities for DSBM disclosed in Daly, and the density of sodium chloride

provided in Bulk Density Chart.  Natural provides no evidence to show that these

densities are wrong, or that the Examiner made a mathematical error.  Natural's only

argument is that these calculations *may be* incorrect.  Supposition alone is not

enough to overcome a strong *prima facie* case of obviousness.

Finally, Natural cannot rebut obviousness based on the alleged superiority of

the GEOMELT® product compared to road salt alone.  The prior art clearly

demonstrated that DSBM – with or without the addition of inorganic salts – has

excellent antifreezing and deicing properties when compared to road salt alone.

Natural has failed to identify any reversible error in the determination that

representative claims 1 and 6 would have been obvious in view of Zdzislaw, Daly

and Public Works.  Because Natural failed to separately argue the patentability of its

other rejected claims, the Board properly found that those claims also would have

been obvious.  For all these reasons, this Court should affirm the Board's Final

Decision and Decision on Request for Rehearing in all respects.

## IV.     ARGUMENT

### A.     Standard of review

Natural has the burden of showing that the Board committed reversible

error.  *In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004).  Obviousness "is a legal

conclusion based on underlying findings of fact." *In re Thrift*, 298 F.3d 1357, 1363 (Fed. Cir. 2002) (quoting *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000)).  These factual determinations include, for example, what a prior art reference teaches (*see Para-Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc*., 73 F.3d 1085, 1088 (Fed. Cir. 1995)); whether it is analogous (*see Wyers v. Master Lock Co*., 616 F.3d 1231, 1237 (Fed. Cir. 2010)); and whether it teaches away from the claimed invention (*see In re Berg*, 320 F.3d 1310, 1312 (Fed. Cir. 2003)).  These factual inquiries also include whether a patentee has demonstrated a nexus between its alleged secondary considerations evidence and the claimed invention. *See In re Mayne*, 104 F.3d 1339, 1341 (Fed. Cir. 1997); *In re Huang*, 100 F.3d 135, 139-140 (Fed. Cir. 1996).

This Court reviews the Board's underlying factual findings for substantial evidence, and the Board's ultimate determination of obviousness without deference.  *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).  This Court has defined substantial evidence as that which "a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1312 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229-30 (1938)).  "[W]here two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that

23

must be sustained upon review for substantial evidence." *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002).

**B.    Substantial evidence supports the Board's determination that the claimed antifreezing and deicing compositions would have been obvious in view of Zdzislaw and Daly and/or Zdzislaw, Daly, and Public Works**

An invention is obvious if the differences between the claimed subject matter and the prior art are such that "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a)[6]; *see also Gartside*, 203 F.3d at 1319.  The Supreme Court has advised that an invention is likely obvious where – as here – the invention is little more than a collection of prior art elements combined according to their established functions to yield only predictable results.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416-17 (2007); *In re Kubin*, 561 F.3d 1351, 1359-60 (Fed. Cir. 2009).

Representative claim 1 recites an antifreezing and deicing composition comprising:  (1) 25-99% by volume DSBM having 60-75% by volume suspended solids, and (2) 1-75% by volume a component selected from a group including ethylene glycol and sodium chloride.  Representative claim 6 recites a deicing

---

[6]  The pre-America Invents Act version of the statute, as quoted above, applies in this case.

mixture comprising DSBM and rock salt at a ratio of 8-10 gallons of DSBM per ton of rock salt.

Representative claim 1 would have been obvious in view of: (1) Zdzislaw's disclosure of an antifreezing composition comprising ranges of DSBM and ethylene glycol overlapping the ranges recited in claim 1, taken in combination with (2) Daly's disclosure of the Steffen method of manufacturing DSBM having 60-75% suspended solids. (*See* A17-A20; A48 at col.5, ll.10-14.) More specifically, Zdzislaw's composition has 4-47% by volume DSBM and 11-85% by volume ethylene glycol(s), claim 1 recites an antifreezing and deicing composition having 25-99% by volume DSBM and 1-75% by volume ethylene glycol. (A18.) The Board found that, although Zdzislaw's compositions are not identical to the composition recited in claim 1, ordinary artisans would have adjusted the relative proportions of DSBM and ethylene glycol(s) in Zdzislaw's composition to arrive at the ranges recited in claim 1 given Zdzislaw's teaching that freezing temperature, viscosity and appearance may be manipulated according to weather conditions by adjusting the ratio of DSBM to ethylene glycol. (A18-A19, A33 (both referring to A53 at Examples I-III).)

Representative claim 6 would also have been obvious in view of Zdzislaw, Daly, and Public Works. (A23-A24.) Public Works teaches that DSBM alone and compositions comprising 8 gallons of DSBM per one ton of a road salt-cinder mix

25

exhibit superior antifreezing and deicing properties when compared to either a road salt-cinder mix or road salt alone.  (A23-A24; *see also* A52-A53.)  The Board found that, although the relative proportions of DSBM and/or road salt disclosed in Public Works are not identical to those recited in representative claim 6 – i.e., 8 gallons of DSBM per ton of rock salt – ordinary artisans would have adjusted their relative proportions to arrive at the amounts recited in these claims.  (A22-A24; A37-A38.)  These calculations also show that Public Works discloses an antifreezing composition having 13-100% by volume DSBM and 0-87% by volume road salt; thus, overlapping the ranges recited in claim 1.  (A21-A22.)  Because Natural failed to separately argue the patentability of its remaining claims, the Board properly found these claims obvious as well.

Once a *prima facie* case of obviousness has been shown – as here – the burden shifts to the patentee to come forward with rebuttal argument or evidence. *See*, *e.g*., *In re Dembiczak*, 175 F.3d 994, 1001 (Fed. Cir. 1999); and *In re Rijckaert*, 9 F.3d 1531, 1532 (Fed. Cir. 1993).  As shown below, each of Natural's rebuttal arguments is unmerited.

**1.    The ordinary artisan would have taken into account any differences between Zdzislaw's DSBM and other DSBMs, and optimized the relative amounts of DSBM and other components to achieve those recited in representative claims 1 and 6**

Natural makes several unavailing rebuttal arguments about alleged differences between the DSBMs disclosed by Zdzislaw and Daly, and the DSBM

recited in the claimed composition – some previously raised before the Board, and some not.  As to those previously raised, the Board correctly rejected Natural's argument (A310-A312, Br. at 24-25) that Zdzislaw's DSBM "may not" be equivalent to the DSBM recited in claim 1 because Zdzislaw's DSBM is the product of an older centrifuge process for desugaring beet molasses, rather than a product of the "more modern" Steffen process disclosed in Daly and the '330 patent.  This argument is undermined by the express teaching in the '330 patent that DSBMs made from both processes "will generally serve equally well" in the claimed composition.  (A19 (quoting A4 at col.5, ll.43-44); *see also* A34.)

The '330 patent's teachings about DSBM equivalency also undermine Natural's argument that Zdzislaw's DSBM cannot be compared to Daly's DSBM for any of the long list of alleged differences catalogued in Natural's brief (Br. at 25-28) – including alleged density differences.  (*See* A32.)  To the extent that Natural asserts that the Board incorrectly found that Zdzislaw's and Daly's DSBMs have the same density (Br. at 24-25), the Board did not find that they were the same.  Rather, the Board agreed with the Examiner that "the densities of the two DSBM[s] would not be so different as to result in values outside the broad range of DSBM recited in claim 1."  (A32.)  The Board also found that even if the DSBM disclosed in Daly does not have the exact density of the DSBM disclosed in Zdzislaw, an ordinary artisan would have optimized the relative amounts of components, including density,

to amounts falling within the ranges recited in Natural's claims, given Zdzislaw's teaching that freezing temperature, viscosity, and appearance can be optimized by adjusting the relative amounts of DSBM and other components.  (A18-A19 (citing A53); A33.)

As to Natural's new arguments about alleged differences in DSBMs, Natural waived those arguments by not raising them before the Board.  *See In re DBC*, 545 F.3d 1373, 1377 (Fed. Cir. 2008).  Even if not waived, those arguments are unavailing.  For example, Natural's argument (Br. at 24) that Daly's DSBM "may not" be equivalent to the DSBM recited in representative claim 1 is baseless because both DSBMs are made by the same process, i.e., Steffen process (*see* A4 at col.5, ll.29-33).

For all these reasons, Natural has failed to demonstrate any error in the Board's findings regarding the prior art DSBMs and the DSBM recited in Natural's claims.

### 2.    Daly is analogous prior art because it is "reasonably pertinent" to the problem facing the inventor of the '330 patent

Natural incorrectly argues that Daly is not analogous prior art and, therefore, cannot be cited in an obviousness rejection against the claimed composition.  (*See* Br. at 27-32.)  Prior art is analogous if it is either (1) from the same field of endeavor, or (2) reasonably pertinent to the particular problem the inventor was trying to solve.  *Wyers v. Master Lock Co*., 616 F.3d 1231, 1237 (Fed. Cir. 2010).

Assuming the '330 patent and Daly are not in the same field of endeavor, Daly is

pertinent to the problem facing the inventor of the claimed composition.

The '330 patent concerns the use of DSBM and polyhydroxide alcohols

and/or inorganic salts mixtures for "preventing the formation of ice or snow on

outdoor surfaces, such as roadways or aggregate stockpiles." (*See* A1 at Abstract.)

The '330 patent acknowledges that mixtures of inorganic salts and the molasses

byproducts of alcohol distillation had been used as antifreezing and deicing agents

since the late 1980s. (A2 at col.1, ll.44-55.) The '330 patent also acknowledges

that, as early as 1997, mixtures comprising inorganic salts and the byproducts of

other distillation processes – e.g., waste products from corn-milling, wine

production, and cheese-making – had also been used as antifreezing and deicing

agents. (A2 at col.1, ll.56-62.)

The '330 patent lists several problems with these earlier compositions that the

inventor hoped to overcome, including poor spreadability caused by a "thick"

consistency at low temperatures (A2 at col.1, l.65 to col.2, l.5), a "putty-like"

consistency at temperatures below 0° F (*id.*); and high levels of solids that clog

spraying and spreading devices (A2 at col.2, ll.4-19). Beyond these problems, the

'330 patent recites a need for a deicing agent that is "low cost," "environmentally

friendly," "non-corrosive," "effective at temperatures well below freezing." (A2 at

col.2, ll.53-55, 59-65.) Thus, as the Examiner correctly found, the problem facing

the inventor was finding a distillation byproduct having each of these desired properties. (*See* A188-A189, A227-A228.)

Daly discloses a distillation byproduct having all of these properties and more. Daly discloses that DSBM "flows at very low temperatures (-30º F., -34.4º C.)" and "can be pumped with a hand, centrifuge[e], piston, or gear pump at ambient temperatures." (A47 at col.2, ll.54-59.) Daly also discloses that DSBM is half the cost of desugared sugar cane molasses, and is "non-toxic, non-abrasive, non-corrosive, biodegradable and environmentally friendly." (A47 at col.2, ll.62-67.) In addition to these desirable properties, Daly discloses the names of several U.S. manufacturers selling DSBM, made by the inventor's preferred process for making DSBM, i.e., the Steffen process. (A48 at col.3, ll.4-24.)

Significantly, the '330 patent incorporates by reference Daly's teachings concerning the production, properties, and suppliers of DSBM:

> The disclosure of [the Daly] patent as it relates to the **production** of desugared sugar beet molasses and the **properties** and various **suppliers** thereof is incorporated herein by reference.

(A4 at col.5, ll.33-36 (emphasis added; *see also* A188-A189, A227-A228).) Thus – as verified by the '330 patent – Daly discloses many things about DSBM that would have been reasonably pertinent to the inventor of the claimed composition. *See Wyers v. Master Lock Co.*, 616 F.3d at 1237.

30

Despite these disclosures, Natural argues that the way Daly uses DSBM is so far removed from the way that the claimed composition is used, that Daly would not have been pertinent to the problem facing the inventor.  As support, Natural relies on this Court's decision in *In re Clay*, 966 F.2d 656 (Fed. Cir. 1992).  (*See* Br. at 29-30.)  In *Clay*, the Court found that a prior art reference disclosing the use of gels to push oil out of underground rock formations was not analogous art to claims to a method of using gels to displace liquid from dead space in oil storage tanks.  *Clay*, 966 F.2d at 659-60.  The Court found that a person trying to solve the problem of dead space in oil storage tanks would not have looked to the cited reference because of the significant temperature and pressure differences between underground rock formations and oil storage tanks.  *Clay*, 966 F.2d at 660.

Natural attempts to analogize the facts of this case to those in *Clay* by arguing that Daly's DSBM mixture is used "in a confined location under pressure within a tire, and not under ambient outdoor conditions on ice and snow," like the claimed composition.  (Br. at 30.)  This argument overlooks the fact that Daly's DSBM mixture is intended for use in the tires of farm, industrial and other outdoor equipment.  (A48 at col. 4, ll.38-40.)  It also overlooks Daly's teaching that, because his mixture will be used outdoors, it "[must] flow in very low temperatures (-30º F and below)."  (A47 at col.1, ll.44-45.)  This argument further ignores the fact that Public Works disclosed that several municipalities had successfully used DSBM to

31

deice roads for the prior two winters – i.e., the prior art demonstrated that DSBM is relevant to the problem facing the inventor.  (*See* A41, A56-A57.)  For all these reasons, Natural has failed to demonstrate that Daly is non-analogous prior art.

**3.     Daly does not teach away from claimed composition simply by stating that inorganic salts are "not necessary" to achieve the antifreezing benefits of DSBM and, therefore, "not preferred"**

Natural argues that Daly teaches away from combining DSBM with inorganic salts, like the mixtures disclosed in Public Works.  (Br. at 48-50.) Natural's only support for this argument is a passage in Daly that concludes with a statement that "compositions using inorganic salts are unnecessary and are not preferred."  (Br. at 49 (quoting A48 at col.3, ll.10-11).)  This argument misapprehends both the law and the facts.

"A reference may be said to teach away when a person of ordinary skill, upon [examining] the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant."  *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).  For example, "a reference teaches away from a combination when using it in that combination would produce an inoperative result."  *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1382 (Fed. Cir. 2007).  In contrast, a reference does not teach away "if it merely expresses a general preference for an alternative invention but does not 'criticize, discredit, or otherwise discourage' investigation into the

32

invention claimed." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc*., 567

F.3d 1314, 1327 (Fed. Cir. 2009) (quoting *In re Fulton*, 391 F.3d 1195, 1201 (Fed.

Cir. 2004)).

When read in context, Daly discloses that inorganic salts are "unnecessary" to

prevent DSBM from freezing at -30º F (and below), and "not preferred" because

they are corrosive to metal wheel rims:

> It has been found that the molasses can be combined with
> inorganic salts commonly used for ballast such as calcium
> chloride or magnesium chloride, if the amount is less than
> fifty percent (50%) by weight.  For reasons which are not
> understood, the molasses, particularly the desugared
> molasses, protects the metal of the rim from rusting and
> actually removes rust from the rim.  Thus, such
> compositions using inorganic salts are unnecessary and
> are not preferred.  Also, unexpectedly, the molasses
> remains in a fluid state and does not freeze and become
> solid even at temperatures as low as -30º F. (and below).

(A48 at col.3, ll.4-14.)  Because Daly does not "criticize" or "discredit" the addition

of inorganic salts to DSBM, or state that adding salt would result in an inoperative

composition (*see* A189-A190, A229-A230), Daly's statements do not meet the

legal standard for teaching away.  *DePuy*, 567 F.3d at 1327; *Fulton*, 391 F.3d at

1201.

### 4.    A person of ordinary in the art would have optimized the ratios of DSBM and salt disclosed in Public Works to achieve the claimed proportions

Natural mistakenly argues that the Board erred in adopting the Examiner's findings about the proportions of DSBM and salt disclosed in Public Works.  (Br. at 35-39.)  Public Works teaches a composition comprising 8 gallons of DSBM per ton of a "mix" containing 25% road salt and 75% crushed cinders.  (A57.)  When the Examiner calculated the amount of DSBM and salt taught by Public Works, he assumed that the amount of salt and cinders in the "mix" were given in % by weight – and not % by volume – because the total amount of the mix is given by weight, i.e., a "ton."  (*See* A193, A649.)  Natural erroneously argues that Public Works cannot be relied on for teaching the claimed ranges of DSBM and salt because and there is no definitive way to know whether these amounts are given in % by weight or % by volume.  (Br. at 35-36; *see also* A305-A306.)  This argument ignores Natural's burden of establishing that the Board's findings are not supported by substantial evidence.  *Watts*, 354 F.3d at 1369.  To prevail, Natural must do more than argue that the Board's findings *might* be wrong or that a reasonable person *might* have made different findings.  *Jolley*, 308 F.3d at 1329 Natural's naked supposition (Br. at 35-36) that the amounts of road salt and cinder in the Public Works' mix *might* be given in % by volume is not enough to carry its burden.

34

Moreover, although Public Works does not expressly state whether the amounts of road salt and cinder used in the mix are given in % by weight or % by volume, the Board found that the Examiner's assumption that the ratio of road salt to cinders in the Public Works' mix is given in % by weight was reasonable, especially given that Public Works discloses the price of road salt in dollars per ton (i.e., "$200/ton").  (A22; A57.)

To the extent that Natural also argues that the ranges of DSBM and road salt recited in Public Works extend too far outside the ranges recited in representative claim 1 to render the claim obvious (Br. at 37-38), Natural's argument is unpersuasive for the same reasons the Board found them so.  Although the amounts of DSBM and salt disclosed in Public Works are not coextensive with those recited in representative claims 1 and 6 – i.e., 13-100% by volume DSBM and 0-87% by volume salt in Field Report 2 compared to the 25-99% by volume DSBM and 1-75% by volume salt recited in claim 1; and 8 gallons of DSBM to a ton of a 25% salt-75% cinder mix in Field Report 2 compared to the 8-10 gallons of DSBM per ton of salt recited in claim 6 – it would have been obvious to workers in the art to optimize the amounts of DSBM and road salt disclosed in Public Works to achieve the amounts recited in claims 1 and 6.  (*See, e.g*., A23.)  The Board found this especially true given Public Works' disclosure of three different deicing compositions comprising different amounts of DSBM and salt.  (A24

35

(citing A56-A57).)  And further motivation to optimize the amounts of DSBM and road salt would have come from Zdzislaw's recommendation that different freezing temperature, viscosity, and appearance may be achieved by adjusting the relative amounts of these components.  (A53; *see also* A19.)  For all these reasons, Natural has shown no error in the Board's findings concerning Public Works.

**C.**    **Natural's evidence of commercial success and industry praise relates entirely to the well-established properties of prior art DSBM compounds, and not to any unique properties of the claimed composition**

When a patentee seeks to overcome a *prima facie* case of obviousness by presenting evidence of non-obviousness, the patentee must establish a nexus between the evidence presented and the specific features of the invention *now claimed*.  *See*, *e.g.*, *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("For objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention.").  Accordingly, if the alleged success of a patentee's product is due to a feature found in the prior art, no nexus exists between the patentee's secondary considerations evidence and the invention now claimed.  *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."); *see also Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006); *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996).

36

Here, all of Natural's secondary considerations evidence concerns the

product GEOMELT®. (*See* Br. at 8-18.) Accepting that GEOMELT® falls within

the scope of Natural's claims,[7] Natural's secondary considerations evidence is

limited to features of GEOMELT® that were already established as features of

prior art antifreezing and deicing compositions containing DSBM. More

specifically, Natural's evidence includes municipal reports, news reports, and

declarations from the inventor, licensees, and customers – all describing the

advantages of GEOMELT® over road salt and/or other non-DSBM-containing

compositions. (*See* Br. at 8-18.) Natural's opening brief highlights portions of its

secondary considerations evidence discussing the alleged features of GEOMELT®

that Natural asserts give rise to its commercial success and industry praise. *Id.*

These features include that GEOMELT® "perform[s] well," "makes the salt 'tacky'

which helps [it] stick to the roadway," "result[s] in less corrosion," melts snow and

ice in "temperatures as low as -25ºF as opposed to straight salt which is only

effective down to 20ºF," "continue[s] to melt ice and prevent freezing over a two

(2) to three (3) day period," "reduce[s] . . . the amount of salt needed per salting

---

[7] Natural's only evidence that GEOMELT is the claimed composition is a Product Data Sheet from its former licensee/the third-party requester, Univar. (*See* A1116, ¶10 (citing A1118-A1122).)

pass," "reduce[s] environmental impact," and works where" road salt alone is ineffective." (Br. at 8-16.)

Each of these alleged advantages of GEOMELT® was a known advantage of DSBM. For example, Zdzislaw teaches that mixtures of DSBM and ethylene glycol(s) have "low freezing temperature[s], good wettability and bulk material penetration," and "high efficiency in terms of preventing freezing and adhesion of bulk materials even with [a] high percentage of water and in low temperatures up to minus 35° C [-31° F]." (A53.) Daly similarly teaches that DSBM "flow[s] in very low temperatures (-30° F. and below)," "can be pumped with a hand, centrifuge[e], piston, or gear pump at ambient temperatures," and is "non-toxic, non-abrasive, non-corrosive, biodegradable and environmentally friendly." (A47 at col.1, ll.44-67, at col.2, ll.54-58, ll.62-67.)

Perhaps most importantly, Public Works discloses the results of field tests using DSBM – alone or in combination with road salt – showing that DSBM performs better than road salt alone. (A20.) For example, Field Report 1 states that DSBM "display[s] residual effectiveness greater than straight magnesium chloride under similar frost conditions," and is able to maintain "a bare and wet road for the first inch of [a snow] storm," and prevent snow pack up to 4 inches of snow. (A56.) Field Report 2 informs that DSBM's thick viscosity provides it with excellent deicing properties and that, when roads were treated with a mixture of DSBM and a

38

road salt-cinders mix, "the snow pack that normally develops during [a] storm broke up by itself and did not need to be treated with a straight salt and scraped off." (A57.) Field Report 2 also informs that 8 gallons of DSBM per ton of the road salt-cinders mix "provide[s] better traction than the [salt-cinder mixture without DSBM] or even straight salt," allowing the Webster Highway Department to "provide a level of service at a much lower cost by using a product that is less corrosive and biodegradable." *Id.* Based on these prior art disclosures, the Board reasonably found that Natural failed to establish that GEOMELT®'s alleged commercial success is attributable to "the elements of the claimed mixture extending beyond the well-known de-icing properties of [other] DSBM mixtures." (A20; *see also* A35-A36.) For all these reasons, Natural has failed to demonstrate the required nexus between its secondary considerations evidence and the claimed composition. *See Huang*, 100 F.3d at 140; *GPAC*, 57 F.3d at 1580; *In re Paulsen*, 30 F.3d 1475, 1482 (Fed. Cir. 1994).

## V.     CONCLUSION

This Court should affirm the Board's determination that the claims on appeal would have been obvious under 35 U.S.C. § 103 because the Board's findings are supported by substantial evidence and Natural has failed to point to any reversible error in the Board's obviousness determination.[8]

Respectfully submitted,

*/s/ Mary L. Kelly*
THOMAS W. KRAUSE
Acting Solicitor

SCOTT C. WEIDENFELLER
Acting Deputy Solicitor

MARY L. KELLY
AMY J. NELSON
Associate Solicitors

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

*Attorneys for the Director of the*
January 28, 2016                    *United States Patent and Trademark Office*

---

[8] The Court should not consider Natural's arguments (Br. at 48-56) about the Examiner's rejections not addressed by the Board. The Board was not required to reach these rejections given its affirmance of the rejection of all claims on other grounds. *See In re Dance*, 160 F.3d 1339, 1340 n. 2 (Fed. Cir. 1998). If, however, the Court reverses the Board's obviousness determination, the Court should remand this case back to the Board to consider these other rejections in the first instance.

## RULE 32(A)(7)(C) CERTIFICATE OF COMPLIANCE

I certify pursuant to Fed. R. App. Proc. 32(a)(7) that the foregoing CORRECTED BRIEF FOR APPELLEE –DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE complies with the type-volume limitation required by the Court's rule.  The total number of words in the foregoing brief, excluding table of contents and table of authorities, is 8,950 words as calculated using the Microsoft Word® software program.

/s/*Mary L. Kelly/*

Mary L. Kelly
Associate Solicitor

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 28, 2016, I electronically filed the foregoing CORRECTED BRIEF FOR INTERVENOR – DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE using the Court's CM/ECF filing system.  Counsel for both Appellant and Appellee were electronically served by and through the Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(a) and 25(b).

*/s/ Mary L. Kelly*
Mary L. Kelly
Associate Solicitor
U.S. Patent and Trademark Office
Mail Stop 8
P.O. Box 1450
Alexandria, Virginia 22313